# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Kimberly Gertman,

                    Plaintiff,        Case No. 1:17-cv-04960

v.                              Michael L. Brown
                                  United States District Judge

City of Atlanta,

                    Defendant.

_____/

## ORDER

Plaintiff Kimberly Gertman brings claims under the Fair Labor Standards Act ("FLSA"), alleging Defendant City of Atlanta misclassified her as an exempt employee and owes her unpaid overtime. The parties filed cross-motions for summary judgment. (Dkts. 38; 51.) The Court grants in part Defendant's motion, denies Plaintiff's motion, denies as moot Plaintiff's request to amend her complaint, and orders the parties to mediate the surviving claims.

## I.    Factual Background

Plaintiff Kimberly Gertman began working for Defendant City of Atlanta as a Corrections Officer Recruit with the Department of

Corrections in January 1999.  (Dkts. 38-6 ¶ 1; 49-2 ¶ 1.)  The City laid her off in January 2003 but rehired her as a Corrections Officer shortly thereafter.  (Dkts. 38-6 ¶¶ 2–4; 49-2 ¶¶ 2–4.)  The City promoted her to Lieutenant in February 2013, where she made a starting annual salary of $40,557.  (Dkts. 38-6 ¶¶ 7–8; 49-2 ¶¶ 7–8.)

The City of Atlanta Department of Corrections is a paramilitary organization with a hierarchy of sworn officers with ascending ranks of Corrections Officers, Sergeants, Lieutenants, Captains, and Majors. (Dkts. 38-6 ¶ 12; 49-2 ¶ 12.)  Corrections Officers report directly to Lieutenants, who themselves report to Captains.  Captains, however, generally work only on weekdays and Majors do not usually work at the jail.  (Dkts. 38-6 ¶ 80; 49-3 ¶ 8.)  Lieutenants thus may be the highest-ranking employee at the jail for shifts outside normal business hours. (Dkts. 38-6 ¶ 80–83; 49-2 ¶¶ 80–83.)  The City classifies all Lieutenants (and all higher ranked positions within the Department of Corrections) as exempt employees under the FLSA.  (Dkts. 38-6 ¶ 9; 49-2 ¶ 9.)

Much of the evidence in this case focused on Plaintiff's job responsibilities as a Lieutenant as compared to a Corrections Officer.  So for instance, Corrections Officers are assigned to fixed posts throughout

the jail by Lieutenants and must remain at their post throughout their shifts.  (Dkts. 38-6 ¶¶ 60–61; 49-2 ¶¶ 60–61.)  Lieutenants, on the other hand, have no fixed posts.   Instead, they have the authority and discretion to decide how and when they will perform their administrative tasks in their office and when they will enter the housing unit or other areas of the jail to supervise the Corrections Officers.  (Dkts. 38-6 ¶¶ 62–63; 49-2 ¶¶ 62–63.)  During a typical eight-hour shift, Lieutenants would spend some amount of time in the office doing their administrative work, though that time could be split up and also varied from shift to shift.  (Dkts. 38-6 ¶ 64; 49-2 ¶ 64; 49-3 ¶ 121.)  On each shift, between twenty and forty Corrections Officers worked and reported to Plaintiff and two other Lieutenants on duty.  (Dkts. 38-6 ¶ 16; 49-2 ¶ 16; 49-3 ¶ 16.)  For the purpose of performance evaluations, each Lieutenant had eight to ten Corrections Officers as direct reports.  (Dkt. 49-3 ¶ 155.)

While in their office, Lieutenants perform administrative duties like (1) meeting with fellow Lieutenants to discuss staffing needs for each shift; (2) preparing the work roster for a shift; (3) assigning Corrections Officers to their posts; (4) reviewing information to communicate to Corrections Officers at the roll call conducted at the beginning of the

shift; (5) responding to inquiries, whether in person or over the telephone, from employees and members of the public; (6) meeting with Corrections Officers to discuss personnel matters including counseling letters, performance evaluations, requests for sick leave and vacation leave, schedule changes, and interpersonal conflicts or disputes among employees; and (7) preparing incident or investigative reports as well any other documentation related to the operations of the Department. (Dkts. 38-6 ¶ 65; 49-2 ¶ 65; 49-3 ¶ 120.)   Lieutenants perform their administrative duties independently with no direct input or supervision from the Captain or another superior officer. (Dkts. 38-6 ¶ 66; 49-2 ¶ 66.) In contrast, Corrections Officers do not have offices and do not perform any of these administrative tasks, except for preparing initial incident reports that must be forward to a Lieutenant for review. (Dkts. 38-6 ¶ 67; 49-2 ¶ 67.)

During a typical shift, Lieutenants spend about sixty to seventy percent of their time interacting with inmates and directing and supervising Corrections Officers. (Dkts. 38-6 ¶ 68; 49-2 ¶ 68.)  While inside the jail, Lieutenants supervise and direct the work of Corrections Officers, Sergeants, and any civilian employees over whom the

4

Lieutenants have direct supervisory responsibility in the absence of a civilian supervisor.  (Dkts. 38-6 ¶ 69; 49-2 ¶ 69.)

While inside the jail and on duty, Lieutenants also (1) conduct floor checks within housing units; (2) take counts of inmates; (3) release detainees; (4) accept inmates from other agencies; (5) escort detainees leaving the jail; (6) interact with the booking area of the jail and with bonding companies; (7) conduct shakedowns of areas to discover any contraband; (8) handle any issues with the kitchen such as broken appliances; and (9) respond to any fights in the jail.  (Dkts. 38-6 ¶ 70; 49-2 ¶ 70.)

The duties of a Lieutenant further include (1) responding to incidents inside the jail (e.g., fights) and incidents outside the jail (e.g., accidents involving Department vehicles); (2) conducting investigations of incidents; (3) handling and resolving employee complaints and disputes; (4) reviewing and approving all documentation related to inmates scheduled for release from the jail; (5) communicating with court personnel regarding any issues affecting an inmate's bond or release; (6) communicating with police officers and resolving any disputes when police officers transport individuals to the jail who should be detained by

another facility (e.g., Fulton County Jail) due to jurisdictional issues; (7) receiving reports from Corrections Officers about maintenance or security issues (e.g., broken cell locks in need of repair) and initiating requests for repairs to the Department's maintenance staff; (8) observing search techniques used by Corrections Officers while they are searching inmates to ensure that the proper search techniques are used; (9) communicating with the Department's Contraband Officer and the Atlanta Police Department when Corrections Officers discover illegal drugs or weapons during searches; and (10) ensuring that contraband is properly secured until it is relinquished to APD. (Dkts. 38-6 ¶ 71; 49-2 ¶ 71.)

Unlike Corrections Officers, Lieutenants are not supposed to search, restrain physically, or subdue inmates. (Dkts. 38-6 ¶ 71; 49-2 ¶ 71.) Because the jail was often short-staffed, however, they often had to do so. When a fight or physical altercation occurs, Corrections Officers notify Lieutenants, who then report to the scene of the altercation and provide direction and supervision to Corrections Officers. (Dkts. 38-6 ¶ 73; 49-2 ¶ 73.)

Notwithstanding the clear-cut distinctions between Corrections Officers and Lieutenants, the undisputed evidence shows that Plaintiff's actual day-to-day activities varied outside the duties of a Lieutenant and crossed into the duties of a Corrections Officer. As a Lieutenant, Plaintiff shared an office with the other Lieutenants on duty. From the office, she performed various tasks, including creating and modifying employee schedules; finding and "calling-in" Corrections Officers to work when other Corrections Officers failed to report for their shifts; answering phone calls from Corrections Officers or other employees; and holding meetings or conferences with Corrections Officers.[1] (Dkts. 38-6 ¶¶ 24–25; 49-2 ¶¶ 24–25.) As a Lieutenant, Plaintiff's scheduling duties also included assigning Corrections Officers to work in specific areas of the jail, such as the housing units or the library. (Dkts. 38-6 ¶¶ 26–27; 49-2 ¶¶ 26–27.)

And while Defendant has policies setting the number of Corrections Officers needed in each housing unit based on the number of inmates,

---

[1] Plaintiff "admits" most of Defendant's undisputed facts but then complains that they are misleading and offers extensive argument in response. (*See, e.g.*, Dkt. 49-2 ¶¶ 26–29 ("Admitted. However, this duty entails virtually no discretion.").) The Court considers these facts admitted.

Plaintiff and other Lieutenants had the authority and discretion to deviate from those rules in a limited way.  When dealing with staffing shortages on a unit, they could (1) open up another housing unit; (2) "run an A & B schedule" that allows inmates housed on different tiers within a unit to alternate free time thus minimizing the number of inmates out of their cells at any given time; or (3) assign additional Corrections Officers to the housing unit.  (Dkts. 38-6 ¶ 28; 49-2 ¶ 28; 49-3 ¶ 132.) Neither Corrections Officers nor Sergeants had this authority.  (Dkts. 38-6 ¶ 29; 49-2 ¶ 29.)

Plaintiff testified that she spent "at minimum, 30 minutes" on scheduling duties but that "[i]t just really depends on the staff level that's always short, which makes scheduling complicated."  (Dkts. 38-6 ¶ 30; 40 at 49:6–18; 49-2 ¶ 30.)  She also testified that she had the authority to change schedules for Corrections Officers and her fellow Lieutenants, with approval from the Captain on duty.  (Dkts. 38-6 ¶ 31; 40 at 49:19–50:7; 49-2 ¶ 31.)  She also testified that she spent a "minimum 30 minutes, max over an hour" trying to find Corrections Officers available to work while creating schedules.  (Dkt. 40 at 52:3–9.)  This included calling a Lieutenant from the previous shift to ask about officers who

were available to work.  (Dkts. 38-6 ¶ 32; 49-2 ¶ 32.)  Although Plaintiff did not spend this much time each day finding Correction Officers to work, doing so was "very frequent."  (Dkt. 40 at 52:3–9.)  As a Lieutenant, Plaintiff also handles calls from Corrections Officers and other employees about various things, including problems in the housing unit, inquiries about detained individuals, and medical issues.  (Dkts. 38-6 ¶ 33; 49-2 ¶ 33.)  She estimated that she spent between five minutes and an hour each day taking calls from Corrections Officers or other employees. (Dkts. 38-6 ¶ 34; 49-2 ¶ 34.)

As a Lieutenant, Plaintiff also held meetings or conferences with Corrections Officers to discuss rule infractions, issue counseling letters, and conduct annual performance evaluations.  (Dkts. 38-6 ¶ 35; 49-2 ¶ 35.)   Plaintiff had the authority to issue counseling letters to Corrections Officers for misconduct (like excessive tardiness) without approval from her superior officers.  (Dkts. 38-6 ¶ 36; 49-2 ¶ 36; 49-3 ¶¶ 170–172.)   Although Plaintiff and other Lieutenants lacked the authority to impose discipline, they had the authority and discretion to recommend disciplinary action against Corrections Officers, as outlined in the Standard Operating Procedures ("SOPs").  (Dkts. 38-6 ¶¶ 50–51;

49-2 ¶¶ 50–51; 49-3 ¶ 178.)  Plaintiff also completed annual performance evaluation forms for Corrections Officers.  (Dkts. 38-6 ¶ 37; 49-2 ¶ 37.) Although Defendant's 30(b)(6) deponent could not testify exactly how Defendant used those evaluation, she explained that it considered them in deciding whether to promote Corrections Officers.  (Dkts. 38-6 ¶ 40; 49-2 ¶ 40.)  The evaluations played no role in determining raises and had no financial impact.  (Dkt. 49-3 ¶¶ 164–165.)

In addition to supervising Corrections Officers, Plaintiff directly supervised the Department's civilian employees when there was no civilian supervisor on duty.  Plaintiff's job duties as a Lieutenant also included interpreting and implementing the Department's SOPs generally.  (Dkts. 38-6 ¶ 42; 49-2 ¶ 42.)  She had no discretion to deviate from them, but they do not anticipate every situation that might arise. (Dkts. 49-2 ¶ 42; 38-6 ¶ 85.)

Plaintiff testified that, after her promotion to Lieutenant in 2013, she continued performing the duties of a Corrections Officer and, in fact, did so ***more often*** than she performed the duties of a Lieutenant.  (Dkts. 38-6 ¶ 52; 49-2 ¶ 52.)   She explained that she continued searching detainees, the housing areas, and the areas outside the housing areas;

escorting detainees through the jail; and conducting "one-on-one" discipline of detainees. (Dkts. 38-6 ¶ 53; 49-2 ¶ 53.) She explained that, as a Lieutenant, she would not search detainees every day. But, it varied from day to day. (Dkts. 38-6 ¶ 54; 49-2 ¶ 54.) When the jail was short-staffed — which, according to Plaintiff, was nearly always — Plaintiff might spend around four to five hours a day searching detainees. (Dkts. 38-6 ¶ 55; 49-2 ¶ 55.) She cannot recall how much time she spent performing Corrections Officers' duties after her promotion and has no documents from which to refresh her recollection. (Dkts. 38-6 ¶ 56; 49-2 ¶ 56.)

Plaintiff retired from the Department of Corrections in October 2017. (Dkt. 38-6 ¶ 123.) She filed this suit two months later, alleging that Defendant misclassified her as an exempt employee and that it thus owes her unpaid overtime and compensatory time. She also asserts claims on behalf of similarly situated employees of the Department of Corrections, though those two other named Plaintiffs have since withdrawn their consent as part of the suit.

Plaintiff moved to amend her complaint to allege that Defendant's violations of the FLSA were willful — thus extending the statute of

limitations by a year. (Dkt. 32.) Defendant moved for summary judgment. (Dkt. 38.) In addition to opposing Defendant's motion, Plaintiff also moved for summary judgment. (Dkt. 51.)

## II.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact that a jury should decide at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). When a plaintiff has the burden of proof at trial, a moving party meets this

12

burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 322–23, 325.  The movant, however, need not negate the other party's claim.  *Id.* at 323.  In determining whether the moving party has met this burden, a court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Entitlement to an overtime exemption under the FLSA is an affirmative defense on which a defendant bears the burden of proof. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008).  To prevail on an affirmative defense at summary judgment then, a defendant must produce "credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *See Celotex*, 477 U.S. at 331.  The Supreme Court has established that an exemption from coverage under the FLSA must be narrowly construed.  *Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *see also Morgan*, 551 F.3d at 1269. Courts may apply the overtime exemptions under the FLSA only to those employees who are "plainly and unmistakably" within the terms and spirit of the law.  *Phillips*, 324 U.S. at 493.

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   Analysis & Discussion

The FLSA establishes minimum labor standards to eradicate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). Congress designed the statute to "aid the unprotected, unorganized[,] and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining

14

power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945). A cornerstone of the FLSA is the requirement that an employer pay an employee overtime when the employee works more than the statutory maximum allowed.[2] 29 U.S.C. § 207(a)(1).

Exemptions from the overtime pay requirement, however, may apply depending on the type of work the employee performs. For instance, the FLSA overtime provisions do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity" as defined by regulations promulgated by the Secretary of Labor. 29 U.S.C. § 213(a)(1). Under the DOL regulations, an employee can be classified as a bona fide executive if: (1) he or she is "[c]ompensated on a salary basis at a rate of not less than $455 per week"; (2) his or her "primary duty is management of the enterprise in which [he or she] is employed or of a customarily recognized department or subdivision thereof"; (3) he or she "customarily and regularly directs the work of two

---

[2] Plaintiff concedes that as a public employee, she is subject to the partial exemption under 29 U.S.C. § 207(k), which gives public employers leeway to require fire protection and law enforcement employees to work beyond the standard limits. (Dkt. 51 at 25 n.3.) The parties thus agree on the applicability of the partial exemption.

or more other employees"; and (4) he or she "has the authority to hire or fire other employees," or his or her "suggestions and recommendations as to the hiring, firing, advancement, promotion[,] or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a).  An employee falls within the administrative exemption if: (1) he or she is "[c]ompensated on a salary basis at a rate of not less than $455 per week"; (2) his or her "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) his or her "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

In 2004, the Department of Labor enacted the so-called "first responder regulation" to narrow the application of the executive and administrative exemptions to employees working in public safety.  Under the regulation, such overtime exemptions "do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers . . . and similar employees, regardless of rank or pay level, who perform

work such as . . . detaining or supervising suspected and convicted criminals, including those on probation or parole . . . or other similar work. 29 C.F.R. § 541.3(b)(1). The "first responder regulation" does not "purport to make all [public safety] officers non-exempt; the determining factor remains the officer's primary duty." *See Mullins v. City of New York*, 653 F.3d 104, 107 (2d Cir. 2011). It "must be applied 'in conjunction with' the executive and administrative exemptions." *Watkins*, 919 F. Supp. 2d at 1263.

The Court must construe these exemptions narrowly, however. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir.1995) (per curiam). An employer asserting an exemption bears the burden of establishing by clear and affirmative evidence that the exemption applies. *Morgan*, 551 F.3d at 1269. And the Court is mindful of its duty at the summary judgment stage to resolve any factual disputes in the light most favorable to the nonmovant and will do so in analyzing the applicability of both the regulation and the exemptions.

### A.    Plaintiff's Classification as an Exempt Employee

### 1.    First Responder Regulation

Plaintiff claims she is subject to the first responder regulation, which would entitle her to overtime compensation as a non-exempt employee.  Defendant says she is not entitled to this exemption.  Both parties argue they are entitled to summary judgment on this issue.  In ruling on their motions, "the dispositive question" the Court must answer is whether Plaintiff's primary duty is as a first responder or as an exempt executive or administrative employee.  *See Watkins v. City of Montgomery*, 919 F. Supp. 2d 1254, 1263 (M.D. Ala. 2013).

In support of her motion for summary judgment, Plaintiff makes arguments about how the regulation "has been given *Chevron* deference" and that the Court must therefore apply it to her.  (Dkt. 60 at 1.)  The Court does not question the validity of the regulation.  The Court, however, must determine whether a genuine issue of fact exists about the regulation's applicability *to this Plaintiff*.

And the Court holds that a genuine dispute of material fact exists about whether Plaintiff qualifies as a covered first responder.  Plaintiff testified that she performed many duties of a Corrections Officer in her

18

role as a Lieutenant.  This was particularly necessary when the jail was short-staffed — which, according to her testimony, was nearly all the time.  Testimony from the City's designated deponent also shows that Plaintiff, as a Lieutenant, spent sixty to seventy percent of her time "interacting with inmates."  Upon her promotion, Plaintiff was not supposed to do the job of a Corrections Officer, but she often did.  (*See* Dkts. 38-6 ¶ 71; 49-2 ¶ 71.)  On occasion, she would spend several hours searching inmates.  (*See* Dkts. 38-6 ¶ 55; 49-2 ¶ 55.)  But the record also suggests that she spent a large portion of her day completing administrative tasks, supervising Corrections Officers, creating schedules for employee coverage, and handling issues between officers, other employees, and members of the public.

When considering the relative importance of Plaintiff's first responder duties compared with her managerial or administrative tasks, the Court finds that a reasonable juror could conclude that this factor weighs in favor of characterizing Plaintiff as a first responder rather than an exempt executive or administrative employee.  The Court thus declines to grant summary judgment to either party on whether Plaintiff, as a Lieutenant with the Department of Corrections, is subject to the first

responder regulation. *See Watkins*, 919 F. Supp. 2d at 1264 (denying summary judgment to defendant employer because factual issue remained about relative importance of plaintiff's first responder duties).

## 2. Executive, Administrative, and Combination Exemptions

The Court likewise finds a factual dispute about whether Plaintiff is subject to the administrative exemption, the executive exemption, or a combination of the two. To satisfy the executive employee exemption,[3] an employee must be one whose (1) "primary duty" is the management of the enterprise or business, (2) who customarily and regularly directs the work of at least two subordinates, and (3) has the authority to hire or fire other employees or whose suggestions "are given particular weight" in deciding who to hire, fire, or promote. *See Diaz v. Team Oney, Inc.*, 291 F. App'x 947, 948 (11th Cir. 2008) (citing 29 C.F.R. § 541.100(a)). And to satisfy the administrative exemption, a plaintiff must (1) have "primary duties" that involve the performance of office or non-manual work

---

[3] Both exemptions also include a minimum salary requirement, but neither party disputes that the first prong has been satisfied. And the Court agrees. Plaintiff took home a salary of $40,557 upon her promotion to Lieutenant and earned an annual salary of $51,888 at the time of her retirement, both far above the $455 per week minimum required by law. (Dkt. 38-6 ¶ 101–102.)

directly related to the management or general business operations of the employer, and (2) "exercise discretion and independent judgment with respect to matters of significance" in performing her primary duties. *Rock v. Ray Anthony Int'l, LLC*, 380 F. App'x 875, 876–77 (11th Cir. 2010) (citing 29 C.F.R. § 541.200(a)).

And under the FLSA, an employee who meets some, but not all, of the elements of the executive and administrative exemptions may still qualify as exempt.  For the combination exemption, a court "focuses solely on the employee's job duties."  *Kuntsmann v. Aaron Rents, Inc.*, 903 F. Supp. 2d 1258, 1260 (N.D. Ala. 2012) (quoting 29 C.F.R. § 541.708).  The combination exemption "provides a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *Id.* at 1265.  A plaintiff, then, is not disqualified from an exemption because she divided her time between administrative and executive tasks, as long as her primary duties consisted of a combination of those tasks.

Given the facts here, however, the Court finds that it cannot definitively rule as a matter of law that Plaintiff "unmistakably" falls into

any of these three exemption buckets.  *See Brock v. Norman's Country Mkt., Inc.*, 835 F.2d 823, 826 (11th Cir. 1988).

In regard to the executive exemption and as discussed above, there is significant factual dispute as to whether Plaintiff's "primary duties" were managerial or those of a front-line first responder.  The Court is not to weigh evidence or make credibility determinations on summary judgment.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  There is also a material dispute about the impact of performance evaluations Plaintiff conducted on Correction Officers she supervised.  Plaintiff lacked the authority to hire or fire Correction Officers.  But, Defendant considered her evaluations in deciding whether to promote Correctional Officers. (Dkts. 38-6 ¶ 40; 49-2 ¶ 40.)  The City's representative could not explain exactly how Defendant considered them or if it gave them "particular weight" — as required by the fourth prong of the executive exemption analysis.  This dispute precludes summary judgment, as Defendant has not met its burden to show that Plaintiff was a bona fide "executive" employee.  *See Barreto v. Davie Marketplace, LLC*, 331 F. App'x 627, 678

(11th Cir. 2009) (per curiam) (vacating award of summary judgment over dispute of fact about whether plaintiff's recommendations were given "particular weight").

The record is also unclear for the administrative exemption. The parties dispute the amount of time Plaintiff spent "interacting with inmates" compared to her office and administrative duties. And Plaintiff testified that she performed the duties of a Corrections Officer more often than she performed the duties of a Lieutenant. (Dkts. 38-6 ¶ 52; 49-2 ¶ 52.) The duties of a Corrections Officer that Plaintiff performed while she was a Lieutenant would have been searching detainees, the housing areas, and the areas outside the housing areas; escorting detainees through the jail; and "one-on-one" discipline of detainees. (Dkts. 38-6 ¶ 53; 49-2 ¶ 53.) These are not non-manual administrative and office duties covered by the exemption.

But the record is muddied further still over how much time Plaintiff actually spent in the shared office conducting office work and making the schedule for Corrections Officers. Plaintiff testified that she spent "at minimum, 30 minutes" on scheduling duties but that "[i]t just really depends on the staff level that's always short, which makes scheduling

complicated." (Dkts. 38-6 ¶ 30; 40 at 49:6–18; 49-2 ¶ 30.) She also testified that she only created the schedule every few shifts, because the other Lieutenants equally shared the responsibility for creating the schedules. A genuine dispute exists about how much time Plaintiff spent on her office duties that might bring her within the administrative exemption. Defendant has thus failed to meet its burden to show that it is entitled to judgment as a matter of law that Plaintiff was a bona fide "administrative" employee.

In sum, the relative importance of Plaintiff's managerial, administrative, and first responder duties is debatable. Genuine questions remain about which of her duties were primary. And the Court cannot say that no reasonable juror could find Plaintiff was non-exempt, entitling Defendant to summary judgment. Likewise, the Court cannot say the opposite — that no reasonable juror could find that Plaintiff was exempt, which would entitle Plaintiff to summary judgment.

On summary judgment, a court may exempt only those employees who are "plainly and unmistakably" within the terms and spirit of the law. *Phillips*, 324 U.S. at 493. Plaintiff is not one of those employees. The Court thus finds summary judgment inappropriate, given the

existence of genuine disputes of fact about whether Plaintiff's primary duty was that of a first responder or an exempt administrative or executive employee.  The Court denies both parties' summary judgment motions on Plaintiff's individual claims based on whether Defendant properly classified her as an exempt employee.

### B.   Plaintiff's Remaining Claims

Because the Court holds that genuine fact issues exist about whether Defendant properly classified Plaintiff as exempt, the Court likewise denies Defendant's motion as to her claims for unpaid compensatory time accruals.  (*See* Dkt. 55 at 14–15 (arguing only that because plaintiff was exempt, defendant owes her no compensatory time).)

In neither her response in opposition to Defendant's motion nor her own motion for summary judgment did Plaintiff address Defendant's argument about the merits of her class allegations.  Defendant argues that Plaintiff cannot show that Lieutenants and Captains are similarly situated with respect to their job requirements and pay provisions.  (Dkt. 38 at 23–24.)  She also cannot show that other employees wish to opt-in to the action.  (*Id.* at 24.)  Finding Defendant's argument meritorious —

and unopposed — the Court grants Defendant summary judgment on Plaintiff's class allegations and dismisses them. The Court will thus allow only her individual claims to proceed.

### C.      Plaintiff's Motion to Amend (Dkt. 32)

Plaintiff moved to amend her complaint to clarify that she was alleging that the City's classification of her as exempt constituted a willful violation of the FLSA and thus would extend her statute of limitations from two years to three. *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162–63 (11th Cir. 2008) (noting that to show willful violation "employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was"). Having reviewed the record, however, the Court finds it devoid of any evidence that Defendant acted willfully. Nothing in the record suggests Defendant either knew or showed a reckless disregard that the FLSA prohibited its conduct. *Cf. Watkins*, 919 F. Supp. 2d at 1266 (finding disputed fact about whether defendant employer misrepresented that it had consulted with DOL about changes to plaintiff's classification, when employer never did). The Court's holding

that Defendant is entitled to summary judgment on Plaintiff's claims for willful FLSA violations moots the need for amendment.  The Court thus denies Plaintiff's motion to amend.  (Dkt. 32.)

## IV.   Conclusion

The Court **DENIES** Plaintiff Kimberly Gertman's Motion for Summary Judgment (Dkt. 51).  The Court **GRANTS IN PART** and **DENIES IN PART** Defendant City of Atlanta's Motion for Summary Judgment (Dkt. 38).  The Court **GRANTS** the motion for Plaintiff's class allegations and willful violation claims but **DENIES** the motion for the remainder of Plaintiff's claims.

Because the Court grants summary judgment to Defendant on the willful violation claim, the Court **DENIES AS MOOT** Plaintiff's Motion to Amend (Dkt. 32).

The Court **ORDERS** this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained mediator must be paid by the parties.  The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation.  The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before April 1, 2020, of their mediation preference.  If they elect to retain their own mediator, the parties shall identify the mediator on or before April 15, 2020.  The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation resulted in a settlement of this action.

The Court **STAYS** this case pending mediation.  The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 11th day of March, 2020.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE